**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. _____**
**ELECTRONICALLY FILED**

**K-9, LLC**
**1060 Airport Road**
**Jackson, MI 49202**

    **Plaintiffs,**

**v.**

**DIAMOND AIRCRAFT INDUSTRIES, INC.**
**1560 Crumlin Sideroad**
**London, Ontario**
**Canada  N5V 1S2**

    **Defendant.**
_____/

## COMPLAINT WITH JURY DEMAND

Plaintiff K-9, LLC ("Plaintiff"), for its Complaint against Defendant Diamond Aircraft Industries, Inc. ("Diamond"), states as follows:

### THE PARTIES

1. Plaintiff is an Indiana limited liability company and is also registered to do business in Michigan with its principal place of business at 1006 Airport Road, Jackson, Michigan 49202.

2. Diamond Aircraft Industries, Inc. ("Diamond") is a Canadian corporation with its principal place of business at 1560 Crumlin Sideroad, London, Ontario, Canada N5V 1S2.

### JURISDICTION AND VENUE

3. Jurisdiction exists by virtue of diversity of citizenship under 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because Plaintiff is domiciled in the United States and

Diamond is a Canadian corporation with its principal place of business in Canada. The matter in controversy exceeds the amount or value of $75,000.00, exclusive of interests and costs.

4. Diamond is subject to the personal jurisdiction of this Court, and is amenable to service of process pursuant to Florida's long-arm statute, FLA. STAT. § 48.193, because Diamond has purposefully availed itself of the privilege of acting in Florida through its significant sales and marketing efforts in Florida. Diamond markets its aircraft to the general public and solicits buyers throughout the United States, especially in Florida. Further, Diamond's primary distributor for the U.S. aircraft market, Premier Aircraft Sales, Inc., is a Florida corporation with its principal place of business in Ft. Lauderdale, Florida.

5. Venue is proper in this Court under 28 U.S.C. § 1391(a)(3) because Diamond is subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

6. Diamond manufactures an aircraft called the Diamond DA42 Twin Star ("DA42"). At all times relevant hereto, the DA42 was powered either by twin 1.7 liter turbo diesel engines ("1.7L" engines) or twin 2.0 liter turbo diesel engines ("2.0L" engines), both of which were manufactured by Thielert Aircraft Engines GmbH ("TAE"), a German corporation.

7. Diamond evaluated and selected the TAE engines specifically for use on its DA42s. As such, at all times relevant to this action, the DA42 was only available with TAE engines.

8. In April or May of 2005, TAE's auditors gave a report describing serious financial irregularities at TAE.

9. In November of 2006, authorities in Hamburg, Germany released a 72-page report outlining the findings of an official investigation of TAE on the grounds that the company attempted to obtain bank loans and stock investors under false pretenses. The details of these investigations were also outlined in a German publication in December of 2006.

10. In the Spring of 2007, the German authorities opened a second investigation against TAE founder Frank Thielert and Chairman of the Board Georg A. Witthun, raising legal issues such as joint attempted fraud and joint attempted falsification of evidence.

11. Because of Diamond's close business relationship with TAE, it knew or should have known about these investigations and TAE's underlying financial problems.

12. Indeed, because the allegations against TAE involved the preparation of fraudulent invoices, Diamond would have been contacted early in the investigation, as Diamond was TAE's largest customer.

13. Despite Diamond's apparent knowledge of TAE's impending financial problems, Diamond never disclosed any of this information to Plaintiffs.

14. Diamond also failed to disclose to Plaintiffs that it was developing its own engine for the DA42.

15. Diamond began developing its own engine in or around June of 2005, which Diamond intended to replace the TAE engines on the entire fleet of DA42s. Diamond's development of an engine for its own airframe was extremely rare in the aircraft manufacturing industry.

16. TAE's financial instability and the development of Diamond's own engine would have been material to Plaintiffs in their decisions to purchase their DA42s.

17. On or around April 24, 2008, TAE entered into an insolvency proceeding in Germany, whereby all TAE engine warranties were voided.

18. Because of TAE's insolvency, the difficulty in getting replacement parts and services, and the voiding of the TAE engine warranties, the fair market value of the DA42 has severely diminished.

**DIAMOND'S AGENCY RELATIONSHIP WITH AUTHORIZED DISTRIBUTORS**

19. Diamond's authorized distributors and their employees were agents of Diamond.

20. Diamond created a network of authorized distributors across the U.S. through which it markets and sells aircraft in the U.S. market.

21. Diamond required its authorized distributors to execute written distributorship agreements, which specified the duties and obligations of the authorized distributors.

22. These distributorship agreements designated specific territories of the United States to each of the distributors and contractually obligated the distributors to market Diamond aircraft in those states.

23. Diamond provides the contact information for all of its U.S. authorized distributors on its website (www.diamondaircraft.com/buy), which enables U.S. customers to log onto Diamond's website, obtain information about Diamond's aircraft, and immediately receive Diamond's recommendation on where to purchase.

24. Diamond trained all of the staff of the authorized distributors on the operations of Diamond's aircraft and mandated strict inventory requirements and sales procedures.

25. Diamond also distributed periodic memoranda to its authorized distributors with updates on promotions or technical problems. These memoranda provided the authorized distributors with precise statements to make to customers and precise guidelines to follow with respect to the issues in the memoranda, which Diamond required the authorized distributors to follow.

26. If distributors do not closely and carefully comply with Diamond's rules, Diamond can and will strip authorized distributors of their status.

27. Diamond participated in all aspects and phases of the sales processes. Even when authorized distributors tried to achieve separation between customers and Diamond's corporate personnel, Diamond insisted on being a part of the transaction.

28. Diamond encouraged individual customers to take delivery of aircraft directly from Diamond's manufacturing facility in London, Ontario or charged the customer around $1,000.00 to have the aircraft delivered to the customer's location.

29. Further, Diamond's representatives often appeared alongside the authorized distributors in sales and promotional settings such as the American Owners and Pilots Association ("AOPA") Expos, Sun n' Fun, and the Experimental Aircraft Association ("EAA") AirVenture air shows in Oshkosh, Wisconsin. At these air shows, individuals from Diamond's corporate offices and individuals from Diamond's authorized distributors wore identical shirts and worked together to answer questions for potential customers.

30. To Diamond's customers, Diamond and its authorized distributors were indistinguishable, which was Diamond's intent.

### TAE ENGINE WARRANTY

31. Diamond created two standard Limited Warranty documents containing Diamond's own statements and representations regarding the length and reliability of the TAE engine warranty. Diamond provided these documents to its authorized distributors, and Diamond intended that these documents be communicated to prospective buyers of DA42 aircraft during the purchase process in order to induce such buyers to purchase the DA42.

32. Diamond and its authorized distributors provided these Limited Warranty documents in order to re-affirm prior representations Plaintiff received regarding the engine warranty.

33. The TAE engine warranty expressly covered the engines for 2,400 flight hours or 12 years. However, because the TAE engines relied on new and untested technology, the FAA placed limitations and restrictions on their use in aircraft.

34. One such restriction was that all TAE engines were assigned a Time Between Replacement ("TBR") of only 1,000 flight hours. This meant that all TAE engines in aircraft had to be removed, inspected, and replaced after only 1,000 flight hours.

35. The FAA later increased the TBR for the TAE engines to 1,200 flight hours, but this figure was still well short of the TAE warranty of coverage for 2,400 flight hours.

36. In order to compensate for the decreased TBR of the TAE engines due to the FAA restrictions, TAE prorated the cost for purchasing a replacement engine. The

6

amount that TAE prorated the cost for the replacement engine varied depending on whether the FAA-imposed TBR was 1,000 flight hours or 1,200 flight hours. Ultimately, the amount that TAE prorated the cost for the replacement engine was designed to provide owners with a value equal to TAE's initial warranty coverage of 2,400 flight hours.

37.  Because the TAE engine technology was new and untested, certain parts, such as the gearboxes, clutches, and other key engine components also had to be replaced every 300 flight hours for diagnostic purposes. While marketing and selling the DA42, Diamond and its representatives also stated the cost of replacing these parts was covered by the engine warranty.

38.  Without the engine warranty covering the required replacements, the DA42 would have been far too expensive to operate and no reasonable purchaser would have elected to purchase it.

## COUNT 1
### (NEGLIGENT MISREPRESENTATION)

39.  In early 2004, Dr. Fuller began negotiations with Northern Air, Inc. ("Northern Air") located in Grand Rapids, Michigan, which was, at the time of negotiations and purchase, an authorized dealer of Diamond, for the purchase of a DA42.

40.  Dr. Fuller also met with Diamond sales representative, Jeff Owen, on several occasions prior to purchasing the DA42. Both Diamond directly and Mr. Owen provided Dr. Fuller with extensive information about the DA42 and its turbo diesel engines manufactured by TAE. Based upon this information and discussions with Mr. Owen, Dr Fuller was assured that all life extension parts and labor were covered under Diamond's extended warranty, and after 1,000 flight hours, he would received a new

7

engine that would be prorated to offset 2,400 flight hours. Regardless, Dr. Fuller was told that the engines and parts were expected to be extended to 2,400 flight hours by the time he reached the 1,000 hours mark.

41. Dr. Fuller was first introduced to Northern Air in Grand Rapids, Michigan after going to Diamond's website which linked him directly to Northern Air as being the closest authorized dealer of Diamond.

42. Dr. Fuller subsequently met with Mr. Owen, who he had previously purchased a plane from, on multiple occasions during 2004 and 2005 at Diamond headquarters located in London, Ontario to discuss the possible purchase of the DA42. More specifically, Dr. Fuller visited Diamond's Ontario factory to meet with Mr. Owen and view the DA42 on or about June of 2005 and August of 2005, in which he discussed with Mr. Owen the details of the aircraft, the power plant, and in particular, the turbo-diesel engine, as he had concerns regarding the related maintenance and operating expenses and costs involved with the new technology. In response, Mr. Owen assured Dr. Fuller that the costs would be covered and provided him with a number of brochures, including the DA42 Twin Star Program Update, dated April 2005, to provide him with additional information regarding the reasons for the delays in Diamond's North American DA42 and the reliability of the new engine technology.

43. During his almost two years of negotiations prior to purchase of the aircraft, at no time did Mr. Owen inform Dr. Fuller Diamond was designing a new engine to replace the engine despite Diamond's awareness of the financial instability of TAE at the time. Based on Dr. Fuller's visits to the Diamond headquarters and negotiations with Diamond sales representative, Mr. Owen, who he trusted and relied upon based on

previous dealings, it was Dr. Fuller's understanding that Diamond would stand behind the products warranted by TAE, including the aircraft's engine.  It was not until TAE announced it was in receivership that Dr. Fuller finally became aware that only TAE, was administering the warranty and that Diamond would not stand in its place.

44.     Throughout the purchase process in 2004 and 2005, Mr. Fuller raised several concerns to Mr. Owen regarding the reliability of the engines.  Dr. Fuller relied entirely on Mr. Owen's representations on behalf of Diamond regarding the engine warranty and life-extension program and Diamond's coverage of the aircraft, including the engines, in making his purchasing decision.  Therefore, after being assured that the engine was completely covered, Dr. Fuller no longer had concerns regarding the new technology, and in reliance upon these assurances, ultimately purchased the aircraft.

45.     In addition to working primarily with Jeff Owen, Dr. Fuller also met with and worked closely with Kris Layson, a representative of Northern Air, which was at the time of negotiation and purchase, a Diamond authorized dealer/distributor.  A strong working relationship was built between Mr. Owen (Diamond), Kris Layson (Northern Air, a Diamond authorized distributor) and Dr. Fuller beginning in early 2004, as evidenced by an email from Jeff Owen to Dr. Fuller setting a future meeting between the two, as well as acknowledgment that Dr. Fuller would be working with Kris Layson to eventually purchase a DA42.  It was on this growing relationship that Dr. Fuller began to rely on representations made by Mr. Layson, as well as Mr. Owen, as Dr. Fuller believed they were all working together under Diamond's umbrella.

46.     Dr. Fuller completed an Aircraft Order Form and put down a deposit with Northern Air on March 19, 2004 which gave him priority to purchase a new DA42 over

other potential customers, as he was a previous Diamond aircraft owner, if one became available in the future. This deposit only provided Dr. Fuller with a preliminary position to have an option to purchase a DA42 in the future. However, it was not until June of 2006, after years of negotiations with Mr. Owen, that Dr. Fuller actually entered into an Aircraft Sales Agreement and paid the remaining cost of the DA42.

47. On or about June 26, 2006, K-9, LLC entered into an Aircraft Sales Agreement and purchased a new DA42, Serial No. 42.0240, N3GQ, for the sum of US $460,332.00, from Northern Air.

48. On delivery and acceptance of the DA-42 on June 26, 2006 at Winona Municipal Airport (KONA) in Winona, Minnesota, Dr. Fuller received a packet of documents relating to the DA42, which included Diamond's Limited Warranty that Mr. Owen had previously referred to when assuring Dr. Fuller that the aircraft and engine would be fully covered.

49. The package of documents received by Dr. Fuller also included a Delivery and Acceptance Certificate, Bill of Sale from Diamond, and a Aircraft Delivery Acceptance Protocol signed by Kris Layson of Northern Air, as well as Walter Suncgrau, a Diamond representative, all of which were signed on June 26, 2006.

50. K-9, LLC relied on Mr. Owen and Mr. Layson's representations to Dr. Fuller regarding the extent of the warranty coverage for the engines when deciding to purchase its DA42. Had such representations not been made, K-9, LLC would not have purchased its DA42.

51. The representations by Mr. Owens were negligent because at the time the representations were made, Diamond knew or should have known that TAE was

suffering from serious financial instability and that it may not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42. Further, Diamond is negligent for any similar representations made by Mr. Layson as Diamond should have made Northern Air, an authorized distributor of its DA42 at the time, aware of these financial problems as it would be a signinficant factor in a customer's, such as K-9, LLC, decision to purchase the DA42 with new engine technology that may no longer be warranted.

52. Diamond knew or should have known that the above misrepresentations made by Mr. Owen would induce K-9, LLC to purchase its DA42, and K-9, LLC reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

53. As a direct and proximate result of K-9, LLC's justified reliance (through Mr. Fuller) on Mr. Owen's misrepresentations, K-9, LLC suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of K-9, LLC's DA42.

## COUNT 2
### (FRAUDULENT MISREPRESENTATION)

54. The representations by Mr. Owen were fraudulent because at the time the representations were made, Diamond knew that TAE was suffering from serious financial instability and that it may not be in a position to support the engines or honor the lengthy warranties Diamond sold along with the DA42.

55. Diamond knew that the above misrepresentations made by Mr. Owen, especially considering the close working relationship between Dr. Fuller and Mr. Owen

after a previous aircraft purchase, as well as the close connection between Dr. Fuller, Mr. Owen and Mr. Layson, would induce K-9, LLC to purchase its DA42, and K-9, LLC reasonably relied on such misrepresentations in purchasing its DA42 and suffered damages.

56. As a direct and proximate result of K-9, LLC's justified reliance on Mr. Owen's and Mr. Layson's misrepresentations, K-9, LLC suffered damages, including: (i) the value of the voided TAE engine warranty; (ii) the additional expenses incurred in repairing TAE engines no longer covered by warranty; and (iii) the diminution in value of K-9, LLC's DA42.

## COUNT 3
### (FRAUDULENT CONCEALMENT)

57. In order to deceive and induce K-9, LLC to buy its DA42, Diamond failed to inform, directly or through its authorized distributor, K-9, LLC that TAE was experiencing serious financial instabilities and that its ability to honor its engine warranties was questionable.

58. As compared to K-9, LLC, Diamond possessed superior knowledge concerning TAE's financial condition and had a duty to reveal that knowledge to K-9, LLC.

59. Diamond was TAE's largest customer and had major business operations in close proximity to TAE's German headquarters. Accordingly, Diamond was aware of news regarding TAE's financial and criminal problems. Specifically, Diamond was clearly aware of such financial problems after a 2007 published interview with Christian Dries, CEO of Diamond, in which Mr. Dries admitted that the main reason Diamond began designing its own engines was because of TAE financial problems.

12

60. In order to deceive and induce K-9, LLC to buy its DA42, Diamond also failed to inform K-9, LLC that Diamond had begun development of its own engine in or around June of 2005, around the same time that Dr. Fuller visited Diamond's Ontario factory to meet with Mr. Owen, which it intended to replace the TAE turbo-diesel engines in the DA42. Diamond had a duty to notify Dr. Fuller of TAE's financial problems and about the development of a replacement engine during these face-to-face meetings with Mr. Owen at Diamond's facility.

61. Diamond possessed exclusive knowledge regarding the development of Diamond's own replacement engine.

62. K-9, LLC, through its sole owner, Dr. Fuller, demonstrated to Diamond that it was concerned about purchasing untested technology used in TAE's engines and was only considering the purchase due to the lengthy, extensive warranty and life-extension program that Mr. Owen touted during the sales process.

63. The concealed information was material to the transaction because had K-9, LLC known that TAE was experiencing financial instability such that TAE may not be able to honor its warranties, and/or if K-9, LLC had known that Diamond was developing its own engine intended to replace the TAE engine in the DA42, K-9, LLC would not have purchased its DA42.

64. Diamond perpetrated the fraud upon K-9, LLC because Diamond benefitted from the sale of the DA42 to K-9, LLC, and would benefit substantially after TAE's financial collapse as it would have a replacement engine to sell to K-9, LLC and other aggrieved purchasers of the DA42, after their warranties became worthless.

65. This concealment was deliberate and knowing, and was designed to cause, and actually did cause, detrimental reliance on the part of K-9, LLC.

66. At no time prior to purchase did anyone disclose to K-9, LLC that TAE was experiencing financial problems such that it may not be able to honor the engine warranty or that Diamond was in the process of developing its own engine to replace the TAE engine in the DA42.

67. K-9, LLC would not have purchased its DA42 if such disclosures had been made.

68. As a direct and proximate result of Diamond's and Northern Air's concealment, K-9, LLC has suffered damages.

## JURY DEMAND

69. Plaintiff, K-9, LLC demands a jury trial on all issues so triable.

**WHEREFORE**, K-9, LLC demands the following:

1. A judgment of monetary and compensatory damages, along with pre-judgment and post-judgment interest, in favor of Plaintiff against Diamond in an amount to be determined at trial; and

2. Such other relief as this Court may deem just and proper.

Dated: July 27, 2011.                                  Respectfully submitted,

s/Juan Martinez
Juan Martinez
Florida Bar No. 9024
GRAY-ROBINSON P.A.
122 Brickell Avenue, Suite 1600
Miami, Florida 33131-0014
Telephone: 305-416-6880
Facsimile: 305-416-6887
E-mail: juan.martinez@gray-robinson.com
COUNSEL FOR PLAINTIFF

4286077_1.doc